In re BELL & BECKWITH Debtor(s).

Charles A. McKENNY, et al Plaintiff(s),

v.

Patrick A. McGRAW, Trustee Defendant(s).

No. 86–0163.
Related Case: 83–0132.

United States Bankruptcy Court,
N.D. Ohio, W.D.

Aug. 10, 1989.

See also, Bkrtcy., 93 B.R. 569.

Louis J. Hattner & Richard E. Wolff, Toledo, Ohio, for Charles & Mary McKenny.

Frank C. Razzano, Shea & Gould, Washington, D.C., for Charles & Mary McKenny.

Charles E. Brown & John W. Rozic, Toledo, Ohio, for Marie P. Schedel.

Fuller & Henry, Toledo, Ohio, for Patrick A. McGraw.

Stephen P. Harbeck, Washington, D.C., for SIPC.

## MEMORANDUM OPINION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This cause comes before the Court on the Complaint filed by the Plaintiffs, Charles A. McKenny and Mary L. McKenny against Patrick A. McGraw as Trustee for Bell & Beckwith under the Securities Investor Protection Act (hereinafter "SIPA"). The Complaint originally contained Six (6) Counts. Count II was dismissed by the Plaintiffs. A Motion for Leave to Intervene was filed by Marie P. Schedel, Executrix of the Estate of Joseph J. Schedel. A Complaint was filed on behalf of the Estate, joining with the McKennys in respect to Count I, seeking a declaratory judgment as to the method of distribution to be employed by the Trustee in distributing customer property under SIPA.

The Plaintiffs filed a Motion for Partial Summary Judgment as to Counts I, IV, V, and VI. The Trustee also moved for Summary Judgment on all Counts of the McKennys' Complaint. The McKennys, the Trustee and the Securities Investor Protection Corporation filed several Briefs in support of their respective positions. At the Trial on Count II, the parties had the opportunity to present the evidence and arguments they wished the Court to consider in reaching its decision. The Court has reviewed the testimony, exhibits, and the arguments of counsel, as well as the entire record in this case. Based on that review, and for the following reasons, the Court finds that the Trustee's Motion for Summary Judgment should be granted as to Counts I, IV, V, and VI. The Court further finds that the Plaintiffs' demand for Judgment as to Count II should be denied, and the Complaint dismissed.

## FACTS

Most of the facts in this case are not subject to dispute. The Defendant in this action is the Trustee for the liquidation of the Debtor-brokerage in the underlying bankruptcy proceeding. Bell & Beckwith, the Debtor, was a stock brokerage firm located in Toledo, Ohio. The brokerage operated as a partnership, and was managed by Edward P. Wolfram, Jr. (hereinafter "Wolfram"). Starting in approximately 1973, Wolfram began systematically diverting cash and securities held by the brokerage. At the time Wolfram's fraud was discovered by a Securities & Exchange Commission examiner in February of 1983, Wolfram had stolen over Forty Million Dollars ($40,000,000.00).

The Plaintiffs, Charles and Mary McKenny, are husband and wife. Charles McKenny is an attorney licensed to practice in the State of Ohio. Both McKennys opened accounts with Bell & Beckwith in the 1950's. *Trial Transcript* at 37. Both Mr. and Mrs. McKennys' accounts were cash accounts. When Mr. McKenny first opened an account with Bell & Beckwith, his stockbroker was George Todd. *Id.* at 37. At the time the McKennys opened their accounts, instructions were given that all securities should be registered in the name of the owner. *Id.* at 38. Those instructions were not renewed with every purchase, but were part of a general understanding that existed between the McKennys and Bell & Beckwith. *Id.* at 38. The McKennys would periodically remind the brokerage of the standing instructions on registration when "somebody would forget, or it wouldn't get done ..." *Id.* at 39. On rare occasions when Mr. McKenny did not wish to hold a security in his own name, because of the possible need for a quick sale, he gave

specific instructions that the security not be registered.

Mr. McKenny testified that he began to purchase United States treasury notes in 1978. *Id.* at 39. The Trustee has maintained, and the McKennys have not disputed, that all the treasury notes which are the subject of Plaintiffs' Complaint were purchased after the 1978 Amendments to SIPA. Mr. McKenny stated at Trial that he spoke to Edward P. Wolfram, Jr. about registering the treasury notes in his own name. Wolfram told Mr. McKenny that treasury notes could not be registered in the owner's name, but assured him that the treasury notes were safe because they were "earmarked" for the McKennys in Bell & Beckwith's records. *Id.* at 40. Wolfram's statement that the treasury notes could not be held in the customer's name was incorrect.

At the time of Bell & Beckwith's collapse, the treasury notes which are the subject of Plaintiff's lawsuit were fully paid for, and were designated "S.K.O." securities in the books and records of the brokerage. In the parlance of the securities industry, "S.K.O." means "Safekeeping only". Despite the S.K.O. designation, Edward P. Wolfram, Jr. wrongfully and fraudulently hypothicated the treasury notes, using them as collateral to cover other loans. It is undisputed that prior to February 5, 1983, the McKennys had the right, under Ohio law, to demand delivery of the treasury notes from Bell & Beckwith.

The Court also heard testimony from Irwin Borowski, Plaintiffs' expert witness on the standards and practices in the securities industry. Although the origins of some of the standards were unclear, Mr. Borowski stated that the McKennys were entitled to rely on their broker's statement that treasury notes could not be held in the customer's name. Moreover, it was the securities industry's practice to put the customer in the same position they would have been in if they had been given accurate and complete statements upon which to rely. In this case, the treasury notes would have been immediately registered in the McKen-

nys' names, and the customer would have been given the benefit as if the registration had occurred at the time the misrepresentation was made. *Trial Transcript* at 112–114.

Prior to the commencement of the liquidation proceeding of Bell & Beckwith, Charles McKenny maintained an account with Bell & Beckwith (Account No. 3621889183) with a net equity of Three Million Five Hundred Eighty-two Thousand Five Hundred Sixty Dollars and Thirty-one Cents ($3,582,560.31). Mr. McKenny's account consisted of cash, stocks, and United States treasury notes. Mary McKenny also maintained a personal account at Bell & Beckwith (Account No. 2984004343) with a net equity of Three Million Five Hundred Twenty-seven Thousand Two Hundred Eighty-nine Dollars and Eighteen Cents ($3,527,289.18). Mrs. McKenny's account also consisted of cash, stocks, and United States treasury notes. In addition, a Bell & Beckwith customer account titled "Liberty Airlines, Inc. Spec. Inst., Mary McKenny, payee" (Account No. 341326341C3) with a net equity of One Hundred and One Thousand Three Hundred Fifty-six Dollars and Nineteen Cents ($101,356.19) has been deemed a customer account of Mary McKenny. The total net equity of all Mary McKenny accounts is Three Million Six Hundred Twenty-eight Thousand Six Hundred Forty-five Dollars and Thirty-seven Cents ($3,628,645.37).

Following the appointment of the Trustee, Plaintiffs filed claims with respect to each of their accounts. *See, Plaintiffs' Exhibits* 10 and 11. The claim forms did not include space for customers to describe the manner in which the securities were held in their accounts. *Trial Transcript* at 42. Using Security Investor Protection Corporation (hereinafter "SIPC") advances, the Trustee advanced Four Hundred Ninety-nine Thousand Nine Hundred Fifty-seven Dollars and Fifty Cents ($499,957.50) in cash and securities to Mr. McKenny with respect to his account, and Mary McKenny received Four Hundred Ninety-nine Thousand Nine Hundred Sixty-two Dollars and Fifty Cents ($499,962.50) with respect to her personal account. These advances re-

duced the claims on their personal accounts to Three Million Eighty-two Thousand Five Hundred Sixty Dollars and Thirty-one Cents ($3,082,560.31) for Charles McKenny, and Three Million One Hundred Twenty-eight Thousand Six Hundred Forty-five Dollars and Eighteen Cents ($3,128,645.18) for Mary McKenny. Initially, no advances were made for the "Liberty Airlines, Inc. Spec. Inst., Mary L. McKenny, payee" account.

On July 23, 1984, the Trustee applied to the Court for authority to make a partial distribution from the fund of customer property. The claims of approximately Sixty (60) customers had not been satisfied by the advances from SIPC, including the McKennys and the Schedel estate. The Court authorized this partial distribution in an Order dated September 14, 1984. Pursuant to a settlement agreement between the McKennys and the Trustee, the "Liberty Airlines, Inc. Spec. Inst., Mary L. McKenny, payee" account was included, and combined with Mrs. McKenny's other account.

As a result of the first partial distribution of customer property, the McKennys received an aggregate of Four Million Three Hundred Seventy-two Thousand Five Hundred Fifty-seven Dollars and Forty-three Cents ($4,372,557.43) with respect to their personal accounts, and Sixty-two Thousand Three Hundred Thirty-four Dollars and Six Cents ($62,334.06) for the "Liberty Airlines, Inc. Spec. Inst., Mary L. McKenny, payee". The total received by the McKennys from customer property was Four Million Four Hundred Thirty-four Thousand Eight Hundred Ninety-one Dollars and Forty-nine Cents ($4,434,891.49). Subtracting that total, and the combined SIPC advances of Nine Hundred Ninety-nine Thousand Nine Hundred Twenty Dollars ($999,920.00), the McKenny accounts were unsatisfied in the amount of approximately One Million Seven Hundred Seventy-six Thousand Three Hundred Fourteen Dollars and Nineteen Cents ($1,776,314.19).

The Declaratory Judgment sought by the Plaintiffs involves the Trustee's distribution of approximately Four Million Five Hundred Thousand Dollars ($4,500,000.00) which is properly allocable to the fund of customer property. The McKennys, and the Schedel estate, seek to have the Trustee distribute the funds to the over-the-limits customers first, ahead of any claim of SIPC for recovery of overadvances made at the beginning of the case. The first partial distribution of customer property allowed SIPC to participate in the distribution and receive reimbursement for the initial overadvances allowed under SIPA. The Trustee and SIPC support using the same methodology in all subsequent distributions. The McKennys assert that while they do not wish to undo the first partial distribution, they believe a different method should be used in the second distribution.

The McKennys have received Sixty-one and a half percent (61.5%) of their claim. If the method supported by the Trustee and SIPC is used in distributing the Four Million Five Hundred Thousand ($4,500,000.00) of customer property, the McKennys would be paid approximately Seventy-nine percent (79%) of their claims. Under the McKennys' proposed method of distribution, all the over-the-limits customers would receive One Hundred Percent (100%) of their claims.

## LAW

*COUNT I: The Proper Method of Allocation and Distribution of Customer Property Under SIPA*

The McKennys' proposed method of allocating customer property, which is supported by the Schedel estate, incorporates several different theories which would all result in full payment to over-the-limits customers, if adopted by the Court. First, they assert that SIPA's allocation provision prohibits SIPC from asserting its subrogation rights until all customers have been paid in full. Second, that in calculating "net equity", only unpaid portions of claims should be included, regardless of the source of payment. Third, that the term "customers" only includes partially unsatisfied customers. Acceptance of any one of these three propositions would result in over-the-limits customers being paid in full.

The Trustee and SIPC support a different method of allocation. Under their theory, overadvances which are made at the beginning of a brokerage liquidation would be returned to SIPC. This would be accomplished by allocating a *pro rata* share of customer property to all customers, and then returning to SIPC the amounts which exceed each customers' ratable share, plus the SIPC advances.

The term "customer property" is defined in § 78*lll* (4), which states in pertinent part:

(4) CUSTOMER PROPERTY

The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted.

The method of allocation is set forth in § 78fff–2(c)(1), which provides:

(c) CUSTOMER RELATED PROPERTY (1) ALLOCATION OF CUSTOMER PROPERTY

The trustee shall allocate customer property of the debtor as follows:

(A) first, to SIPC in repayment of advances made by SIPC pursuant to section 78fff–3(c)(1) of this title, to the extent such advances recovered securities which were apportioned to customer property pursuant to section 78fff(d) of this title;

(B) second, to customers of such debtor, who shall share ratably in such customer property on the basis and to the extent of their respective net equities;

(C) third, to SIPC as subrogee for the claims of customers;

(D) fourth, to SIPC in repayment of advances made by SIPC pursuant to section 78fff–3(c)(2) of this title.

The parties have stipulated that SIPC did not advance any funds to recover securities, and therefore no allocation need be made under § 78fff–2(c)(1)(A). Accordingly, the allocation to customers, who share ratably in customer property, is the first applicable allocation subsection. SIPC, as subrogee, is the next to receive an allocation under SIPA.

The method of distribution proposed by the Trustee and SIPC would include a *pro rata* distribution to all customers, under SIPA § 78fff–2(c)(1)(B), regardless of whether or not their claims have been satisfied by advances from SIPC. The amounts allocated to fully satisfied customers would then be allocated to SIPC in reimbursement of overadvances made in the early stages of the Bell & Beckwith liquidation proceeding pursuant to § 78fff–2(c)(1)(C). The McKennys contend that any payments to SIPC must wait until after all customer claims are fully paid under subsection (B).

*A. The "Plain Meaning" of SIPA*

The McKennys make several different arguments in support of their position. First, they assert that the "plain meaning" of § 78fff–2(c)(1) mandates that SIPC not participate in any distribution while the McKennys' claim remains unsatisfied. The Trustee and SIPC also cite the "plain meaning" doctrine in support of their position.

As is true in every case involving the construction of a statute, the starting point must be the language employed by Congress. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931, 936 (1979). In *United States v. Turkette*, the Supreme Court stated:

If the statutory language is unambiguous, in the absence of "a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." Of course, there is no errorless test for identifying or recognizing "plain" or "unambiguous" language. Also, authoritative administrative constructions should be given the deference to which they are entitled, absurd results are to be avoided and internal inconsistancies in the statute must be dealt with.

*United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246, 252–253 (1981) (citations omitted).

Subsection 78fff–2(c)(1)(B) states that customers "shall share ratably in such customer property on the basis and to the extent of their respective net equities ..."

The Trustee and SIPC contend that the statute plainly calls for participation by *all* customers, not just those who remain partially unsatisfied. The McKennys dispute this interpretation. They contend that the statute establishes four separate levels of participation, each of which must be completed in accordance with its terms before the next level can be addressed. Any reimbursement of SIPC would impermissibly place SIPC at the same level as the claims of unsatisfied customers.

The McKennys appear to assume that the term "allocation" has the same meaning as "distribution". Under the Trustee and SIPC's reading of the statute, "allocation" would be the equivalent of "assignment" or "allotment". *See, Jacobson v. Bowles*, 53 F.Supp. 532, 534 (N.D.Tex. 1944). The Defendants see "allocation" as a bookkeeping entry, rather than physical distribution.[1]

The "plain meaning" arguments are not persuasive. An examination of the allocation section cannot, standing alone, provide a foundation for the Court's decision. SIPA is a fairly technical statute with many interlocking provisions and definitions. While § 78fff–2(c)(1) may have a plain meaning within the context of SIPA, standing alone the language fails to offer a compelling reason for the Court sanctioning either method of distribution. While the statute's "plain meaning" appears to support the Defendants' view that allocation should be made to all customers, the next subsection, § 78fff–2(a)(1)(C) does raise the question of how SIPC can be reimbursed before the McKennys have received full payment of their net equity claims. However, the resolution of any apparent conflict should be based upon an in depth examination of the terms used in the allocation provision, the structure of SIPA, and the purposes and history of the legislation.

## B. The Meaning of the Term "Ratably"

The term "ratably" has been used in previous legislation intended to provide protection to investors in the event of insolvency. In *American Surety Co. v. Bethlehem National Bank*, the Supreme Court stated: "A 'ratable' distribution requires that dividends be declared proportionately upon the amount of all claims as they stand on the date of insolvency. This is settled law." 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241, 244 (1941). The Supreme Court discussed the term "ratably" in an earlier insolvency case, *United States v. Knox:* "Dividends are to be paid to all creditors ratably, that is to say, proportionally. To be proportionate they must be made by some uniform rule. They are to be paid on all claims against the Bank previously proved or adjudicated. All creditors are to be treated alike." 111 U.S. 784, 786, 4 S.Ct. 686, 687, 28 L.Ed. 603, 603 (1884).

Recent cases have continued to follow the earlier Supreme Court interpretations of "ratably". *See, F.D.I.C. V. Liberty National Bank & Trust Co.*, 806 F.2d 961, 965 (10th Cir.1986). The meaning of "ratably" in the context of SIPA is discussed in *Matter of Bevill, Bresler & Schulman, Inc.*, 59 B.R. 353 (D.N.J.1986), *appeal dismissed*, 802 F.2d 445 (3rd Cir.1986). In *Bevill, Bresler*, Judge Debevoise reviewed the procedure a trustee follows to satisfy net equity claims:

Second, the trustee determines each customer's ratable share of customer property. This is accomplished by calculating the percentage of all net equity

---

1. It is interesting to note how the House of Representatives was using the term "allocation" at the time H.R. 8331 was under consideration. Numerous 1977 House Reports on budgetary matters use the word "allocation" in their titles. *See,* 13174–1 *House Special Reports I,* 5–841, 95th Cong., 1st Sess. at III–V (table of contents) (*see, e.g.,* H.R.Rep. No. 19, *Allocation of budget totals by program.,* 95th Cong., 1st Sess. (1977); H.R.Rep. No. 128, *Allocation of budget totals to subcommittees, fiscal 1977, pursuant to sec. 302, Congressional budget act of 1974, Committee on Small Business.,* 95th Cong., 1st Sess. (1977); H.R.Rep. No. 360, *Allocate budget totals under 1st concurrent resolution, fiscal 1978, Committee on International Relations.,* 95th Cong., 1st Sess. (1977).) It appears that in this context, "allocation" refers to a process more in the nature of an allotment, which may then be allocated again by those charged with the more detailed budgetary decisions.

claims which each customer's claim represents, and multiplying those percentages by a total value of all customer property. If the difference between the customer's net equity and his ratable share is less than the amount of SIPC protection, the customer claim will be satisfied in full. If the difference between the customer's net equity and his ratable share is greater than the amount of SIPC protection, the customer will receive only his ratable share plus the maximum SIPC allowance, and the customer must look to the debtor's general estate for satisfaction of the remainder of his claim.

*Bevill, Bresler,* 59 B.R. at 363.

It should be noted that the *Bevill, Bresler* opinion would include *all* net equity claims in the determination of each customers ratable share. The final sentence indicates that the customer will receive only their ratable share, based on a calculation which includes all net equity claims. This passage appears to support the position taken by the Trustee and SIPC.

## C. The Meaning of the Term "Net Equity" and "Customer"

Nevertheless, the McKennys argue that the method of allocation advocated by the Trustee and SIPC is incorrect. They contend that the concept of "net equity" is not fixed, but rather is fluid. Similarly, once customers are paid, even though payment is from SIPC overadvances, they cease to be "customers". The Trustee and SIPC disagree. They maintain that the definitions are fixed at the date of filing and do not change in the manner proposed by the McKennys.

The Defendants cite the language in SIPA § 78*lll* (11), defining "net equity":

**(11) NET EQUITY**

The term "net equity" means the dollar amount of the account or accounts of a customer, to be determined by—

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase *on the filing date,* all securities positions of such customer (other than customer name securities reclaimed by such customers); minus

(B) any indebtedness of such customer to the debtor *on the filing date;* plus

(C) any payment by such customer of such indebtedness to the debtor which is made with the approval of the trustee and within such period as the trustee may determine (but in no event more than sixty days after the publication of notice under section 78fff–2(a) of this title.)

In determining net equity under this paragraph, accounts held by a customer in separate capacities shall be deemed to be accounts of separate customers.

(emphasis added).

Pursuant to this definition, the Trustee and SIPC argue that "net equity" is fixed as of the filing date, subject only to (1) any increase in "net equity" engendered by a customer's payment of an indebtedness owed to the broker under SIPA § 78*lll* (11)(C), or (2) some fluctuation based upon a post-filing date transaction.

The McKennys assert that ratable distribution must be determined on the basis of outstanding net equity claims as of the time of the proposed distribution. They cite the fact that prior to the 1978 Amendments to SIPA, § 78fff(c)(2)(B) stated that customers were to share ratably in a "single and separate fund ... on the basis of their respective net equities *as of the filing date* ..." (emphasis added). The McKennys attach significance to the fact that, in enacting the 1978 Amendments, Congress omitted the qualifying phrase "as of the filing date". The McKennys view this change as an intentional and purposeful act on the part of Congress. According to the McKennys' theory, the change in the language of the statute reflects the intention of Congress to transform "net equity" from a fixed concept into a flexible one which takes into account the fact that a customer's net equity claim diminishes over time because of SIPA advances and distributions of customer property. Thus, in calculating the customer fund fraction, the Trustee should include only those net equi-

ty claims which are still outstanding at the time of the distribution.

Under the McKennys' theory, § 78*lll* (11) only provides a benchmark for determining net equity. The phrase "on the filing date" refers only to the amount which would have been realized had the securities been liquidated at the time of filing. Consequently, the definition does not dictate the time at which net equity is immutably fixed, rather it only provides a reference point in time for valuing the securities in a customer's account. Once any payment is made, both the customer's net equity and the fund of customer property must be adjusted to reflect their status after such distribution.

The Trustee and SIPC point to the addition of a second reference to "on the filing date" in the definition of net equity, (*See*, § 78*lll* (11)(B)) which was added at the same time the phrase was removed from the preamendment allocation provision. The Defendants argue that the "on the filing date" phrase was removed simply because it became redundant. Further, they contend major changes in the structure of SIPA, such as the one suggested by the McKennys, would have been discussed in the legislative history. The Plaintiffs were unable to point to any legislative history on the change they claim was intended in the 1978 Amendments.

It is true that under 15 U.S.C. § 78fff–2(b) the filing date does provide the benchmark for determining net equity. *See, Securities Investor Protection Corp. v. Vigman*, 803 F.2d 1513, 1517 n. 1 (9th Cir.1986); *Matter of Bevill, Bresler & Schulman, Inc.*, 83 B.R. 880, 892 (D.N.J. 1988). However, the Plaintiffs have offered no compelling reason to convince the Court that net equity must be recalculated after SIPC advances.

■ Moreover, if the effects of the Plaintiffs' "floating net equity" theory are considered in the framework of a SIPA liquidation proceeding, rejection is mandated because the theory appears to produce an "absurd" result. *See, United States v. Turkette*, 452 U.S. at 580, 101 S.Ct. at 2527, 69 L.Ed.2d at 253 (1981). Using the Plain-

tiffs' method, the percentage of allocation would be variable, depending on when SIPC's advances were made to customers. If SIPC held off advancing funds to the trustee until after the distribution of all of the fund of customer property, the percentage of payment would be significantly lower to over-the-limits customers than if SIPC made advances up to the Five Hundred Thousand Dollar ($500,000.00) statutory limit prior to any customer property distribution. The Plaintiffs have offered no statutory or policy reasons why different results should obtain based on the timing of SIPC advances in relation to the distribution of the fund of customer property. The fixed net equity definition supported by the Defendants provides all customers the same results regardless of the timing of advances and distributions. Accordingly, the Court finds that net equity was intended to be fixed as of the filing date, and is not "recalculated" in the manner proposed by the Plaintiffs.

■ The McKennys also attack SIPC's distribution method because, in their view, the term "customers" should only include partially unsatisfied customers. "Customers" is defined in SIPA § 78*lll* (2), which states in pertinent part:

**(2) CUSTOMER**

The term "customer" of a debtor means any person ... who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term "customer" includes any person who has a claim against the debtor arising out of sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities.

The Plaintiffs direct attention to the use of the words "who has a claim" in the definition of the term "customer". Based on that phrase, the McKennys contend that persons who have been paid no longer have

claims against the debtor. Accordingly, when the Trustee makes an allocation to "customers" pursuant to § 78fff–2(c)(1)(B), only the partially unsatisfied customers should be included.

The Defendants counter the McKennys' contention by citing the language in § 78fff–2(c)(1)(C), where allocation is made to SIPC "as subrogee for the claims of *customers*" (emphasis supplied). Thus, under the Plaintiffs' theory, which would include only partially unpaid claimants as "customers", SIPC's subrogation right would also disappear when the claims were paid. It appears improbable that Congress would intend such a result. Thus, while Plaintiffs' position might seem plausible when viewed in isolation, when examined within the context of SIPA as a whole, the McKennys' "deleted customer" theory must be rejected.

### D. Is SIPA In Pari Materia With FDIA And FCUA?

■ The Plaintiffs also contend that their proposed method of distribution is supported by reference to the Federal Deposit Insurance Act (hereinafter "FDIA") and Federal Credit Union Act (hereinafter "FCUA"), which are *in pari materia* with SIPA. Statutes which are *in pari materia* should be construed in the same way. *United States v. Stauffer Chemical Co.*, 684 F.2d 1174, 1188 (6th Cir.1982), *aff'd,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). However, for statutory provisions to be construed together under the *in pari materia* doctrine, they must relate to the same subject or object. *Common Cause v. Federal Election Com'n*, 842 F.2d 436, 441–442 (D.C.Cir.1988). It is the McKennys' position that the protection of investors in insolvent institutions constitutes the common purpose of the statutes. Thus, the statutes must be harmonized, resulting in SIPC being unable to exercise its right of subrogation against any entity other than the debtor, Bell & Beckwith. It is the McKennys' contention that SIPC is attempting to assert a claim directly against them.

The Defendants dispute the McKennys' proposition that SIPA is *in pari materia* with the other statutes. A liquidation proceeding under SIPA is "conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of title 11 …" to the extent those chapters are consistent with the provisions of SIPA. *See,* SIPA § 78fff(b). SIPA is also construed as if it constituted an amendment to, and was included as a section of, the Securities and Exchange Act of 1934. *See,* SIPA § 78bbb. The statute itself makes no reference to FDIA or FCUA.

In addition, the Defendants offer a quote from *Securities Investor Protection Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314 (2d Cir.1976), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976):

> Appellees point to provisions of the Federal Deposit Insurance Act (FDIA), which provide insurance coverage to the beneficiaries of customer accounts, in urging that a similar result be reached here. We cannot accept appellees' analogy of the two statutes in the case at bar. SIPA and FDIA are independent statutory schemes, enacted to serve the unique needs of the banking and securities industries, respectively. The Congress recognized this when it rejected several early versions of the SIPA bill which were patterned on FDIA and which extended insurance coverage to certain beneficial interests represented by customer accounts.

533 F.2d at 1318 (footnotes omitted); *See also,* 4 *Collier on Bankruptcy*, Subchapter III, INT–3 n. 12 (15th ed. 1987).

Finally, the Trustee and SIPC argue that a comparison of SIPA with the other statutes leads to a different conclusion than the one proposed by the McKennys. According to the McKennys' theory, Congress expressly limited the subrogation rights of statutorily created corporations like the Federal Deposit Insurance Corporation. Thus, Plaintiffs contend that the subrogation rights of those corporations can only be asserted against the debtor institutions. However, by not incorporating language

from the other statutes, the Defendants maintain that Congress showed its intention to omit any limitations that may be found in the other insolvency protection statutes. Thus, in the absence of such limiting language, the Trustee and SIPC can stand not only in the shoes of the Debtor, but also, in the proper circumstances, SIPC can stand in the shoes of customers against third parties. *See, Securities & Exchange Com'n v. Albert & Maguire Sec. Co., Inc.,* 560 F.2d 569, 574 (3rd Cir. 1977).

Moreover, SIPC disputes the premise underlying the McKennys' entire *in pari materia* argument. SIPC maintains that there is nothing in the Federal Deposit Insurance Act which requires all bank customers who exceed the limits of FDIA protection to be satisfied in full before the Federal Deposit Insurance Corporation may assert its subrogation rights. SIPC claims that FDIC shares equally with unsatisfied depositors in a liquidation under FDIA. SIPC also notes that the McKennys fail to cite any cases in support of their reading of FDIA. No cases which cite the sections of FDIA and FCUA upon which the McKennys rely appear to support the McKennys' assertion.

■ In any event, it appears that the Plaintiffs' position cannot be sustained. First, the Trustee and SIPC are not asserting a claim directly against the McKennys. They are simply employing a method of distribution which includes all customers in the allocation. The fact that this method will result in the McKennys and the Schedel estate receiving less than under the method they propose does not necessitate the conclusion that any claim is being made against the McKennys directly. Moreover, although in general terms it may be said that SIPA was "intended to provide protection for brokerage house customers somewhat similar to that afforded bank depositors by the Federal Deposit Insurance Corporation ..." *S.E.C. v. Albert & Maguire,* 560 F.2d at 571, the two statutes are not *in pari materia. Securities Investor Protection Corp. v. Morgan, Kennedy & Co.,* 533 F.2d at 1318.

## E. The Legislative History of SIPA

The legislative history advanced by the Plaintiffs in support of their position is also unpersuasive. The McKennys rely primarily on the *Report To The Board Of Directors Of The Securities Investor Protection Corporation,* prepared by the Special Task Force To Consider Possible Amendments To The Securities Investor Protection Act of 1970 (hereinafter "Task Force Report"). The Task Force Report is reprinted in *Securities Investor Protection Act of 1977: Hearings on H.R. 8331 Before the Subcomm. on Consumer Protection and Finance of the Comm. on Interstate and Foreign Commerce,* 95th Cong., 1st Sess. 99–166 (1977). (Hereinafter *"1977 House Hearings"*) A fine review of the Task Force Report, and its relevance in interpreting SIPA, are found in *Matter of Bevill, Bresler & Schulman, Inc.,* 59 B.R. 353, 370–372 (D.N.J.1986).

Turning to the substance of the McKennys' position, they quote a recommendation from the Task Force: "SIPC's claims based on advances to protect customers, to compensate liquidation personnel, and to pay other administrative expenses would share in the general estate on a parity with claims of other creditors." *1977 House Hearings,* at 141. The Plaintiffs do concede that the above approach was not incorporated into SIPA § 78fff–2(c)(1). However, the McKennys contend that in amending SIPA, Congress adopted a framework where SIPC holds a position of intermediate priority between the Debtor's customers and its general creditors. Thus, SIPC's subrogation rights should not permit it to displace and take over the valid claims of customers.

From the Task Force Report itself, the McKennys highlight a portion of the preliminary list of major policy objectives described at the beginning of the Report. It recommended that customer property in the possession of the debtor "should be used to satisfy the claims (for cash or securities) of customers *or* SIPC as subrogee." *1977 House Hearings* at 112–113 (emphasis added). The use of the disjunc-

tive "or" rather than the conjunctive "and" suggests to the Plaintiffs that the claims of customers are separate, and superior to, the rights of SIPC to be reimbursed for overadvances.

The McKennys offer the House and Senate Reports accompanying the 1978 Amendments as further evidence for their contention that SIPA's legislative history supports the method of allocation that they advocate. Both reports state:

> Section 8(c) § 78fff–2(c). This section establishes the priority in which customer property shall be allocated.
>
> ... Second, remaining customer property would be allocated ratably among customers in satisfaction of their respective net equity claims. To an extent that a customer's net equity claim is unsatisfied by customer property, the customer is entitled to an advance of funds from SIPC up to the amount permitted by the bill.
>
> Third, SIPC shall *then* be reimbursed as subrogee for the claims of customers which it has satisfied with its own funds. (emphasis added)

S.Rep. No. 763, 95th Cong., 2d Sess. at 13, *reprinted in* 1978 U.S.Code Cong. & Ad. News 764, 776; *see also,* H.Rep. No. 746, 95th Cong., 1st Sess. at 29 (1977).

The McKennys contend that the use of the word "then" indicates Congress' explicit intention that SIPC must await the full satisfaction of all customers' claims before it may assert its claim for subrogation.

The Trustee and SIPC respond by denying that the Task Force Report contradicts their interpretation of the proper method of allocation. They also cite the holding of Judge Debevoise in *Matter of Bevill, Bresler & Schulman, Inc.:* "There are clear indications in the legislative history of the 1978 Act and the statute itself that Congress did not adopt the allocation plan proposed by the Task Force." 59 B.R. at 371. The opinion discusses various specific recommendations which were rejected. *Id.* at 371–372. Thus, the weight which should be accorded to the Task Force Report, on questions concerning SIPA's method of allocation, would appear to be slight.

After reviewing the legislative history related to the allocation issue, the Court finds it to be sparse and unpersuasive. It will not play a significant role in the determination of the allocation issue.

## F. The Policy Behind SIPA

The next arena in which the parties present their respective arguments is public policy. The McKennys argue that the policy behind SIPA is to provide protection to investors, not to SIPC. As the Supreme Court stated in *Securities Investor Protection Corp. v. Barbour:* "Congress' primary purpose in enacting the SIPA and creating the SIPC was, of course, the protection of investors." 421 U.S. 412, 421, 95 S.Ct. 1733, 1739, 44 L.Ed.2d 263, 271 (1975). The origins of SIPA are discussed at the beginning of the *Barbour* opinion:

> Following a period of great expansion in the 1960's, the securities industry experienced a business contraction that led to the failure or instability of a significant number of brokerage firms. Customers of failed firms found their cash and securities on deposit either dissipated or tied up in lengthy bankruptcy proceedings. In addition to its disastrous effects on customer assets and investor confidence, this situation also threatened a "domino effect" involving otherwise solvent brokers that had substantial open transactions with firms that failed. Congress enacted the SIPA to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers. S Rep No. 91–1218, pp. 2–4 (1970); HR Rep No. 91–1613, pp 2–4 (1970)

421 U.S. at 415, 95 S.Ct. at 1736, 44 L.Ed.2d at 267.

The method of distribution proposed by the Trustee and SIPC is challenged by the McKennys based on these policy considerations. As the title of the statute connotes, the Securities Investor Protection Act is intended to protect investors. On the other hand, the McKennys argue, the Trustee's proposed method of distribution would mainly benefit SIPC and the securities in-

dustry as a whole. In enacting SIPA, Congress removed from the investing public the risk of loss from the bankruptcy of a broker-dealer, and placed that risk on the investment industry. To insure that SIPA would have sufficient funds to carry out Congress' intent, SIPA § 78ddd(a) and (c) provide that SIPC may increase its members' assessments in order to restore the fund, should it become depleted by advances to customers pursuant to a liquidation.

The Plaintiffs take the position that the Trustee's method of distribution would erode investor confidence, particularly large-scale individual, and institutional, investors who currently account for the major percentage of trading on the securities markets. If SIPC is permitted to receive a share of the distribution of the fund of customer property, all investors who happen to be "over-the-limits" of SIPA protection will be placed in greater risk of losing a substantial part of their investment. In effect, the Trustee's and SIPC's reading of the statute will require the Plaintiffs, and other large-scale investors, to indirectly subsidize SIPC's advances to other customers. Thus, large-scale investors would be discouraged from participating in the securities market. Such an interpretation would be in direct conflict with Congress' intent in enacting SIPA. *See, SIPC v. Barbour, supra.*

The Trustee and SIPC believe their method of distribution reflects Congress' intent, and the policy decisions that were made in enacting SIPA. Contrary to the Plaintiffs' assertions, nowhere in either case law or legislative history is there evidence that Congress intended to provide unlimited protection to customers of failed brokerage houses. This limited approach to insuring investor funds is reflected in the Five Hundred Thousand Dollar ($500,000.00) limit in guaranteed protection. *See, Matter of Bevill, Bresler & Schulman, Inc.,* 94 B.R. 817, 824 n. 5 (D.N.J.1989).

Case law which has examined the question of Congress' intent, support the Trustee and SIPC. As the Second Circuit Court of Appeals stated in quoting an earlier decision in a footnote in *SIPC v. Morgan, Kennedy & Co.*:

> As appellants point out in their brief, this Court observed in *SEC v. Parker, Wilbur & Co.,* 498 F.2d 978, 983 (2d Cir. 1974) that: "Arguments based solely on the equities are not, standing alone, persuasive. If equity were the criterion, most customers and creditors of Packer Wilbur, the bankrupt, would be entitled to reimbursement for their losses. Experience, on the other hand, counsels that they will have to settle for much less. SIPA was not designed to provide full protection to all victims of a brokerage collapse."

533 F.2d 1314, 1317 n. 4 (2nd Cir.1976), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2650, 49 L.Ed.2d 387 (1976).

The Sixth Circuit has made similar observations concerning the intent underlying SIPA. In *Securities & Exchange Com'n v. Ambassador Church Finance/Development Group, Inc.,* the Court of Appeals stated:

> There are indications in the legislative history that Congress was seeking to restore investor confidence by protecting customers who deal in relatively small securities transactions. Remarks of a number of Senators and House members contained references to the necessity for protecting small investors as a means of restoring confidence.

679 F.2d 608, 612 (6th Cir.1982). *See also, SIPC v. Morgan, Kennedy & Co.,* 533 F.2d at 1321; *Securities & Exchange Com'n v. Baroff Co., Inc.,* 497 F.2d 280, 281 (2d Cir.1974); E. Guttman, *Broker-Dealer Bankruptcies,* 48 N.Y.U.L.Rev. 887, 909 (1973).

The Defendants view the policy behind SIPC as being the protection of small investors who are less sophisticated than large-scale, and institutional, investors. Moreover, the funds for SIPC come from assessments from members, which are passed through to investors by way of higher commission rates. Any increase in those assessments would correspondingly increase the costs to all investors, particularly

small-scale investors who are not eligible for volume discounts.

Neither side points to any determinative policy reason which would clearly favor their interpretation of the allocation provision. It is obvious that SIPA does not contemplate unlimited protection to all investors. Congress was primarily concerned with protecting small investors. However, there are no policy reasons cited by the Trustee and SIPC which foreclose the McKennys' interpretation of SIPA § 78fff–2(c)(1).

### G. The Allocation Methods Within the Context of SIPA

Finally, the Court will consider the two proposed methods of allocation within the context of the entire statute. "A statute should be read and construed as a whole and, if possible, given a harmonious, comprehensive meaning." *United States v. Stauffer Chemical Co.*, 684 F.2d 1174, 1184 (6th Cir.1982), *aff'd*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984).

The Plaintiffs contend that their method of allocation fits comfortably within the context of the entire SIPA. The Plaintiffs look to the last paragraph in SIPA § 78fff–3(a) which states:

> To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have at law or in equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this chapter, except that SIPC as subrogee may assert no claim against customer property until after the allocation thereof to customers as provided in section 78fff–2(c) of this title.

The McKennys argue that this provision supports their method, relegating SIPC to a position of intermediate priority. Thus, § 78fff–2(c)(1)(C) places SIPC below the priority enjoyed by customers, but with rights which are superior to those possessed by the Debtor's general creditors.

The Trustee and SIPC contend that their interpretation is superior and is required for SIPA to be internally consistent. First, the Defendants reiterate that the term "ratably" requires that the fund of customer property be shared by *all* customers on the basis and to the extent of their respective net equities. *See*, § 78fff–2(c)(1)(B); *Bevill, Bresler*, 59 B.R. at 361; 4 *Collier on Bankruptcy*, Subchapter III, INT–16 (15th ed. 1987). Under the Defendants' theory, the Trustee may not exclude any customers from their allocation of their ratable share, which can be expressed as the following fraction:

$$\frac{\text{NET EQUITY IN CUSTOMER'S ACCOUNT}}{\text{TOTAL NET EQUITY CLAIMS OF ALL CUSTOMERS}}$$

*See, Defendant's Brief In Opposition To Plaintiffs' Motion For Partial Summary Judgment And In Support Of Defendant's Motion For Summary Judgment*, at 17 n. 5.

Once the fund of customer property has been allocated to all customers pursuant to SIPA § 78fff–2(c)(1)(B), the Trustee then, and only then, is allocated a portion of the fund of customer property as subrogee for the overadvances made to customers.

The Trustee and SIPC cite the first paragraph in SIPA § 78fff–3(a) which states in pertinent part:

> (a) **ADVANCES FOR CUSTOMERS' CLAIMS**
>
> In order to provide for prompt payment and satisfaction of net equity claims of customers of the debtor, SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each customer, as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property ...

This policy of "prompt payment" of the amount "by which the net equity of each customer exceeds his ratable share of customer property" must also be read in light of the method used to calculate the initial distribution of cash or other assets. SIPA § 78fff–2(b) provides:

### (b) PAYMENTS TO CUSTOMERS

After receipt of a written statement of claim pursuant to subsection (a)(2), of this section, the trustee shall promptly discharge, in accordance with the provisions of this section, all obligations of the debtor to a customer relating to, or net equity claims based upon, securities or cash, by the delivery of securities or the making of payments to or for the account of such customer (subject to the provisions of subsection (d) of this section and section 78fff–3(a) of this title) insofar as such obligations are ascertainable from the books and records of the debtor or are otherwise established to the satisfaction of the trustee. For purposes of distributing securities to customers, all securities shall be valued as of the close of business on the filing date. For purposes of this subsection, the court shall, among other things—

(1) with respect to net equity claims, authorize the trustee to satisfy claims out of moneys made available to the trustee by SIPC notwithstanding the fact that there has not been any showing or determination that there are sufficient funds of the debtor available to satisfy such claims ...

Again, the Trustee is directed to act promptly. Pursuant to this provision the initial distribution of cash or securities is conducted based upon the wholly theoretical, most conservative assumption that the fund of customer property will be found to contain no assets whatsoever. Thus, each customer would be entitled to retain his or her proportionate share of the fund of customer property (which using the conservative assumption called for in § 78fff–2(b)(1), would be nothing) plus the SIPC advance up to the limit of protection provided by SIPA. If, upon investigation by the Trustee, the fund of customer property was found to actually be zero, no further accounting would be necessary.

However, where, as in the present case, the Trustee determines there are "customer property" funds available for distribution, further determinations are necessary. First, the size and composition of customer property must be ascertained. Second,

each customer's ratable share is computed. Third, the Trustee calculates how much SIPC was, in retrospect, actually obligated to pay each customer under SIPA § 78fff–3(a) and thus, how much SIPC had paid in excess of that obligation. These overadvances are reimbursed through SIPA § 78fff–2(c)(1)(C). In other words, the customer property is allocated to each customer, and then the amount overadvanced is allocated to SIPC.

The Trustee and SIPC maintain that their method of allocation precisely follows the intent of Congress that small investors be put back in control of their assets promptly. By allowing SIPC to stand in the shoes of customers after the Trustee has allocated the fund of customer property, Congress has set up an administratively efficient system which eliminates unnecessary transfers of money by permitting direct payments to SIPC, rather than actual distributions to overpaid customers in exchange for the return of the initial overadvances.

SIPC and the Trustee also contest the McKennys' assertion that their method of distribution would be compatible with the rest of SIPA. The McKennys' method would require SIPC to advance, in the aggregate, a larger sum on behalf of customers than is permitted by SIPA § 78fff–3(a). That section states that "... SIPC shall advance to the trustee such moneys, not to exceed $500,000 for *each customer*, as may be required to pay or otherwise satisfy claims for *the amount by which the net equity of each customer exceeds his ratable share of customer property* ..." This provision cannot be reconciled with any proposed allocation where customer property is allocated to only "partially unsatisfied" customers. The maximum SIPC advance under SIPA § 78fff–3(a) is calculated with respect to *"each customer"*.

In the present case, SIPC advanced a total of Forty-two Million Three Hundred Eighty Thousand Six Hundred Three Dollars and Fifty-one Cents ($42,380,603.51) to the Trustee for the payment of customer net equity claims. SIPC was able to make

these advances quickly because SIPA § 78fff–2(b)(1) authorizes a trustee to use funds from SIPC prior to any calculation of each customers ratable share of customer property. But this does not allow SIPC, or the Trustee, to ignore the statutory limits set forth in SIPA § 78fff–3(a). Unless the Trustee returns to SIPC those funds which exceed the aggregate maximum advances permitted by § 78fff–3(a), that section would be rendered meaningless.

An additional fault in the McKennys' proposed method of distribution is the prohibition against certain customers receiving funds advanced by SIPC to satisfy their net equity claims. This prohibition is set forth in SIPA § 78fff–3(a)(4), which states:

> ⸱ (4) no advance shall be made by SIPC to the trustee to pay or otherwise satisfy, directly or indirectly, any net equity claim of a customer who is a general partner, officer, or director of the debtor, a beneficial owner of five per centum or more of any class of equity security of the debtor (other than a nonconvertible stock having fixed preferential dividend and liquidation rights), a limited partner with a participation of five per centum or more in the net assets or net profits of the debtor, or a person who, directly or indirectly and through agreement or otherwise, exercised or had the power to exercise a controlling influence over the management or policies of the debtor . . .

The Defendants point to the language which prohibits SIPC advances from benefiting the listed individuals *"directly or indirectly"*. Yet, the allocation method proposed by the McKennys would apparently satisfy the net equity claims of such person *in full*, notwithstanding the fact that the fund of customer property is insufficient to satisfy their claims *without* SIPC advances. Thus, at a minimum, the McKennys' proposed allocation method benefits the prohibited group "indirectly".

The other example which was discussed *ante* is the variation in the amount over-the-limits customers would receive based on the timing of SIPC advances. This also weighs against the McKennys' contention that their method fits harmoniously within the framework of SIPA.

■ Viewing the different methods in the context of the entire statute, the Trustee and SIPC clearly have the correct interpretation. The McKennys' method of allocation produces too many inconsistencies and conflicts to be the procedure intended by the drafters of the current SIPA statute. Conversely, while the Defendants' position requires a more complex textual analysis, it allows SIPA to be read as a unified whole. *See, Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591–592, 7 L.Ed.2d 492, 499 (1962). Accordingly, the Court adopts the method of allocation proposed by the Trustee and SIPC, and will direct that all future distributions be done on that basis.

*COUNT II: The Status of the Treasury Notes Sought by the McKennys*

■ The McKennys contend that the Trustee is obligated to return all of the treasury notes which were held for them by Bell & Beckwith because the treasury notes are "customer name securities". Pursuant to SIPA § 78fff–2(c)(2), customer name securities are to be returned to their owners by the Trustee. The McKennys do not dispute the fact that the treasury notes were not actually registered in their names. Nevertheless, the Plaintiffs claim that the treasury notes are customer name securities under SIPA. They assert that the treasury notes were in the process of being registered pursuant to instructions from the Debtor, and therefore fit under the SIPA definition. The McKennys introduced expert testimony to show that their securities were in the process of being registered under the standards and practices of the brokerage industry.

It is the position of the Trustee and SIPC that the treasury notes are not customer name securities, and that SIPA's definitions are controlling. The Defendants cite *Bevill, Bresler & Schulman, Inc.,* 59 B.R. 353 (D.N.J.1986), *appeal dismissed,* 802 F.2d 445 (3rd Cir.1986) in support of their position.

The *Bevill, Bresler* opinion directly addresses most of the issues raised in the balance of the McKennys' Complaint. It appears that the decision in *Bevill, Bresler* accurately states the law to be applied in this case. Accordingly, the remainder of this Opinion will rely, to a great extent, on the discussion and analysis found in the cited portions of that case.

The definition of customer name securities is found in SIPA § 78*lll*(3), which states:

### (3) CUSTOMER NAME SECURITIES

The term "customer name securities" means securities which were held for the account of a customer on the filing date by or on behalf of the debtor and which on the filing date were registered in the name of the customer, or were in the process of being so registered pursuant to instructions from the debtor, but does not include securities registered in the name of the customer which, by endorsement or otherwise, were in negotiable form.

The McKennys have argued that the treasury notes were in the process of being registered pursuant to instructions by the Debtor. They base their position on the standards and practices in the brokerage industry. According to the testimony of Mr. Borowski, who the Court allowed to testify as an expert, it is the practice of brokerages to make customers whole when they have been injured by an error attributable to a broker. The standards of the industry require that the customer be put in the same position they would have been in if the broker had properly advised them.

The McKennys contend that because Edward P. Wolfram, Jr. misled them when they asked him to register the treasury notes in their own names, their instructions should be given effect. The instructions from the debtor should be presumed or imputed because of the industry practice of putting the customer back into the position he or she would have been in if the correct information had been given by Wolfram.

A similar position was taken in regard to Wolfram's representation that securities held in accounts designated "S.K.O." ("Safekeeping Only") were as safe as securities held in a customer's own name, and the McKennys would be able to get their treasury notes back at any time.

While the McKennys may have stated a cause of action for fraud against Wolfram and Bell & Beckwith based upon the above facts, it does not alter the fact that the treasury notes do not fit within the statutory definition of "customer name securities". Preliminarily, the Court adopts Judge Debevoise's discussion of the definition of "customer name securities" in *Bevill, Bresler*, 59 B.R. at 358–362; *and cf., Matter of Bevill, Bresler & Schulman, Inc.,* 94 B.R. 817, 831–832 (D.N.J.1989).

The definition of customer name securities is intended to provide a clear mechanical test for those who are charged with the task of liquidating an insolvent brokerage. Congress knew that fraud would be one of the many causes of insolvency in the securities industry. Thus, the statute takes into account the possibility that wrongdoing may be a factor in any brokerage's collapse. Accordingly, SIPA's definition of customer name securities protects only those securities which *cannot* be negotiated. *See*, SIPA § 78*lll*(3). Further evidence that Congress considered the possibility of fraud is found in the definition of "customer", which includes "any person who has a claim against the debtor arising out of sales or conversion of such securities ..."

Moreover, the definition of "customer property" provides evidence that Congress considered the type of issue which is presently before the Court. The definition of customer property is found in SIPA § 78*lll* (4), which states in pertinent part:

### (4) CUSTOMER PROPERTY

The term "customer property" means cash and securities (except customer name securities delivered to the customer) at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, *including property unlawfully converted.* (emphasis added)

Accordingly, the definitions of "customer name securities" and "customer property" being clear, and it appearing that Congress considered and limited the equitable discretion of the Court, the McKennys' position must be rejected. *See, In re Dominelli,* 788 F.2d 584, 586 (9th Cir.1986); *In re Government Securities Corp.,* 95 B.R. 829, 832 (S.D.Fla.1988).

*COUNTS IV and V: Return of the Treasury Notes Based on State Law Theories*

■ The McKennys also seek return of the subject treasury notes based on two state law theories. Under the first, the McKennys argue that the holding of the treasury notes in safekeeping by Bell & Beckwith constituted constructive delivery of the treasury notes to the Plaintiffs pursuant to O.R.C. § 1308.24. Thus, the treasury notes were not property over which the Trustee could assert any right, title or interest. The McKennys make essentially the same argument based on the existence of a constructive trust. These Counts must be rejected because they are superseded by SIPA under the Supremacy Clause. *See,* U.S. Const. Art. 1, § 8, cl. 4, 18.

Again, the Court concurs with Judge Debevoise's position as stated in *Bevill, Bresler,* 59 B.R. at 373, 374, and in a more recent decision, *Matter of Bevill, Bresler & Schulman, Inc.,* 94 B.R. 817, 824–827 (D.N.J.1989). In SIPA, Congress has manifested its intention to create a statutory framework which fully deals with this aspect of the liquidation process. The definition of "customer property" clearly includes the treasury notes which are at issue in this case. Therefore, under the Supremacy Clause of the U.S. Constitution, inconsistent state laws must give way to SIPA, a federal statute. *See, Chicago Board of Trade v. Johnson,* 264 U.S. 1, 10, 44 S.Ct. 232, 234, 68 L.Ed. 533, 536 (1924); *Butner v. United States,* 440 U.S. 48, 54 n. 9, 99 S.Ct. 914, 918 n. 9, 59 L.Ed.2d 136, 141 n. 9 (1979). Accordingly, the McKennys cannot recover the treasury notes based on state law which conflicts with the plain language of SIPA.

*COUNT VI: Is SIPA Constitutional?*

■ The final issue raised by the McKennys is the constitutionality of SIPA. This issue was considered in *Bevill, Bresler,* 59 B.R. at 374–377, and the Court adopts the conclusions presented therein. The McKennys attack SIPA's constitutionality based on the Taking Clause, U.S. Const. amend. V. As this Court has previously recognized in this case, there is a presumption of constitutionality afforded all legislation. *In re Bell & Beckwith,* 50 B.R. 437, 439 (Bankr.N.D.Ohio 1985).

The McKennys seek to prove that SIPA's provisions operate as a taking of their property without just compensation. While the *Bevill, Bresler* opinion offers more than adequate grounds for granting Summary Judgment in favor of the Trustee and SIPC, the Court will consider the application of the facts in this case to a "taking" analysis.

In the present case, the McKennys were deceived as to whether their treasury notes could be registered. However, the McKennys have not disputed that all of their treasury notes were purchased after the enactment of the 1978 Amendments to SIPA. Thus, they were on notice that in the event that Bell & Beckwith was liquidated under SIPA, their unregistered treasury notes would only be protected up to the limit of SIPA protection. *See, In re John Muir & Co.,* 28 B.R. 946, 949 (Bankr. S.D.N.Y.1983). Even after they were deceived as to the possibility of placing treasury notes in their own names, the McKennys could have avoided losses upon the occurrence of a SIPA liquidation. They could have invested in only those securities that they thought could be placed in customer name form. Or, they could have had their treasury notes in several brokerages, at levels under the limits of protection provided by SIPA.

Because the treasury notes were purchased after the enactment of the 1978 Amendments, the "taking" is not retroactive. As was noted in *Bevill, Bresler,* the only bankruptcy legislation which has ever failed to pass constitutional muster under a Fifth Amendment "taking" analysis has

been provisions which adversely impact upon investor expectations relating to property interests established prior to the challenged legislation. *Bevill, Bresler,* at 375.

The decision of the Supreme Court in *United States v. Security Industrial Bank,* 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) offers an analogous situation for purposes of a Fifth Amendment "taking" analysis. Holding securities in customer name form is somewhat similar to a valid purchase money security interest in household goods, or a security interest coupled with possession. "Customer property" is analogous to non-possessory, non-purchase money security interests. Continuing with the analogy, it is not unconstitutional for § 522(f)(2) to divest creditors of rights in property (i.e. lien rights) so long as those rights were created after the effective date of the Bankruptcy Code. Under the holding *Security Industrial Bank,* Congress may rationally distinguish between possessory and non-possessory security interests in bankruptcy legislation. In a like manner, it appears that Congress may treat customer name securities differently than securities held in street name, or some other negotiable form. It is only if rights are divested retroactively that there is "substantial doubt" that destruction of the liens comports with the requirements of the Fifth Amendment. *Security Industrial Bank,* 459 U.S. at 78, 103 S.Ct. at 412, 74 L.Ed.2d at 243.

Similarly, the avoiding powers of trustees in bankruptcy have been consistently upheld. It follows that a distinction based upon the quality of "notice to the world", in this case by keeping securities in a non-negotiable form, can properly withstand constitutional scrutiny if it is not applied retroactively. *Cf. In re Washburn & Roberts, Inc.,* 795 F.2d 870 (9th Cir.1986); *In re Caro Products,* 746 F.2d 349 (6th Cir. 1984).

In conclusion, the Court specifically finds that the McKennys were not "disproportionately" burdened under the test set forth in *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631, 648 (1978).

The impact on the McKennys will not be disproportionate. They will receive the same ratable share of customer property, plus the Five Hundred Thousand Dollars ($500,000.00) SIPC advance, that the other over-the-limits customers will receive. The interference with their investment backed expectations will not be excessive. As previously noted, SIPA was in place at the time they invested in the subject treasury notes, and left them in Bell & Beckwith's "safekeeping". Thus, knowledge of the law being imputed, they assumed the risk of some losses for securities that fit the definition of customer property and were in excess of the limits of SIPA protection. Finally, as held in *Bevill, Bresler,* SIPA is a public program designed to adjust the benefits and burdens of economic life to promote the common good. 59 B.R. at 377. Accordingly, the Court finds that SIPA is not unconstitutional under the Fifth Amendment.

The Defendants having prevailed, the Court will not address their affirmative defenses.

In reaching these conclusions, the Court has considered all the evidence and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

ORDERED that Plaintiffs' Motion for Summary Judgment on Count I of Plaintiffs' Complaint be, and is hereby, Denied.

It is FURTHER ORDERED that the Defendants' Motion for Summary Judgment on Count I of Plaintiffs' Complaint be, and is hereby, Granted.

It is FURTHER ORDERED that the Plaintiffs' demand for judgment on Count II of Plaintiffs' Complaint be, and is hereby, Denied.

It is FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment on Count IV of Plaintiffs' Complaint be, and is hereby, Denied.

It is FURTHER ORDERED that Defendants' Motion for Summary Judgment on Count IV of Plaintiffs' Complaint be, and is hereby, Granted.

It is FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment on Count V of Plaintiffs' Complaint be, and is hereby, Denied.

It is FURTHER ORDERED that Defendants' Motion for Summary Judgment on Count V of Plaintiffs' Complaint be, and is hereby, Granted.

It is FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment on Count VI of Plaintiffs' Complaint be, and is hereby, Denied.

It is FURTHER ORDERED that Defendants' Motion for Summary Judgment on Count VI of Plaintiffs' Complaint be, and is hereby, Granted.

It is FURTHER ORDERED that the Trustee make all further distributions in conformity with this Opinion.

It is FURTHER ORDERED that Plaintiffs' Complaints be, and hereby are Dismissed.